No. 127,357

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

MCKAINE TYSON FARR,
*Appellant*.

SYLLABUS BY THE COURT

1.

Distribution of fentanyl is a crime under K.S.A. 21-5705(a)(1) and by extension distribution of fentanyl causing death is a crime under K.S.A. 21-5430(b).

2.

The law of causation has two core elements: cause-in-fact and legal causation. Cause-in-fact requires proof that, but for the defendant's conduct, the result would not have occurred. Legal causation limits a defendant's liability to the reasonably foreseeable consequences of his or her conduct.

3.

Requiring but-for causation for the crime of distributing a controlled substance causing death under K.S.A. 21-5430(b) does not foreclose the possibility of multiple contributing factors playing a role in producing an outcome.

4.

Because there is no consequence under the Kansas Offender Registration Act for failing to notify the defendant of the registration requirement at the time of conviction, the failure to do so does not void the registration order.

Appeal from Pottawatomie District Court; JEFFREY R. ELDER, judge. Oral argument held April 14, 2026. Opinion filed August 14, 2026. Affirmed.

*James M. Latta*, of Kansas Appellate Defender Office, for appellant.

*Tyler W. Winslow*, assistant solicitor general, and *Kris W. Kobach*, attorney general, for appellee.

Before WARNER, C.J., ARNOLD-BURGER, J., and LAURA JOHNSON-MCNISH, District Judge, assigned.

ARNOLD-BURGER, J.: A jury convicted McKaine Tyson Farr of one count of distribution of a controlled substance causing death, based on evidence that Jayson Ebert died of a drug overdose after he purchased a controlled substance—fentanyl pills—from Farr. The forensic pathologist/medical examiner concluded that Ebert's cause of death was a combination of fentanyl and cocaine intoxication, but that fentanyl had a more significant effect on causing Ebert's death because it had a greater lethality and Ebert's physical condition was more consistent with an opioid overdose. At sentencing, the court imposed a 165-month prison sentence and ordered Farr to register for a term of 15 years under the Kansas Offender Registration Act (KORA), K.S.A. 22-4901 et seq. Farr appeals his conviction and the court's registration order. After a careful review of the record and applicable law, we affirm Farr's conviction and registration requirement.

FACTUAL AND PROCEDURAL HISTORY

In 2022, the State charged Farr with one count of distributing a controlled substance causing death, a felony. The charge stemmed from Farr selling fentanyl pills to Ebert in September 2021, after which Ebert died from a drug overdose less than 48 hours later due to a combination of "fentanyl and cocaine intoxication."

At trial, Farr's defense primarily related to whether the fentanyl he distributed caused Ebert's death. The State presented a video of a recorded interview, as well as a transcript, during which Farr admitted that he sold fentanyl pills to Ebert before his death. So the trial evidence focused mainly on whether Ebert's death resulted solely from fentanyl use.

To that end, the State presented expert testimony from a forensic toxicologist who confirmed that Ebert had fentanyl, norfentanyl (a fentanyl metabolite), and benzoylecgonine (a cocaine metabolite) in his system when he died. Another of the State's experts, the forensic pathologist who conducted Ebert's autopsy, testified that Ebert's cause of death was due to "combined fentanyl and cocaine intoxication." Yet he explained that Ebert's physical condition presented as more consistent with an opioid overdose than a cocaine overdose for various reasons. The forensic pathologist opined that "if it weren't for the fentanyl, I don't think Jayson Ebert would be dead."

Farr presented expert testimony from a professor of pharmacology, who agreed with the stated cause of death. Yet the defense's expert explained that cocaine and fentanyl had a synergistic effect that increased their potency, so it was impossible to determine whether Ebert's use of fentanyl alone was an independently sufficient cause of death.

During the instruction conference, Farr objected to the district court's proposed elements instruction. In particular, Farr had submitted a proposed instruction advising the jury that "'[r]esulted from' means that the State must prove that Jason [*sic*] Ebert would not have died but-for his use of heroin [*sic*] distributed by McKaine Farr. It is not enough for the State to prove only that the use of heroin [*sic*] distributed by McKaine Farr contributed to Jason [*sic*] Ebert's death." The court rejected Farr's request, concluding that the "contributed to language" was not proper.

The jury convicted Farr as charged. At sentencing, the district court imposed a 165-month prison sentence and ordered Farr to register under the KORA for 15 years.

Farr timely appeals.

ANALYSIS

Farr raises several claims of error, consisting of seven issues in support of reversing his conviction and one relating to the district court's registration order. We will address each in turn, although some necessarily are combined.

DISTRIBUTION OF A CONTROLLED SUBSTANCE CAUSING DEATH INCLUDES THE DISTRIBUTION OF FENTANYL

According to Farr, K.S.A. 21-5705 (statute criminalizing unlawful cultivation or distribution of controlled substances) does not specifically list "fentanyl" within the types of controlled substances that are illegal to distribute in Kansas. From that premise, he makes the following claims: (1) distribution of fentanyl causing death is a "nonexistent crime," so the district court lacked subject matter jurisdiction; (2) even if distribution of fentanyl is a crime, the State failed to prove by sufficient evidence that the fentanyl distributed in this case met the applicable legal definition.

4

*The district court had subject matter jurisdiction.*

District courts acquire subject matter jurisdiction in a criminal case only if the State has charged a crime recognized by a Kansas statute. See *State v. Jordan*, 317 Kan. 628, 643, 537 P.3d 443 (2023) (citing *State v. Dunn*, 304 Kan. 773, Syl. ¶ 2, 375 P.3d 332 [2016]). Farr argues that distribution of fentanyl causing death is a "nonexistent crime," so the district court lacked subject matter jurisdiction.

Consideration of Farr's claim involves interpreting various Kansas statutes. We are guided in determining a statute's meaning by the overarching rule that the intent of the Legislature governs if that intent can be ascertained. We do that through a review of the statutory language enacted, giving common words their ordinary meanings. When a statute is plain and unambiguous, the court should not speculate about the legislative intent behind that clear language and should refrain from reading something into the statute that is not readily found in its words. *State v. Keys*, 315 Kan. 690, 698, 510 P.3d 706 (2022). So we turn to the statute to divine its meaning.

*Distribution of fentanyl is a crime.*

Like Hansel and Gretel in the forest, we must follow several breadcrumbs to reach our conclusion that distribution of fentanyl is a crime. We begin with the charge.

The State charged Farr with distribution of a controlled substance causing death under K.S.A. 21-5430(b): "Distribution of a controlled substance causing death is distributing a controlled substance in violation of K.S.A. 21-5705 . . . , when death results from the use of such controlled substance."

But what is a controlled substance? The same statute defines it as having "the same meaning" as it is given in K.S.A. 21-5701. K.S.A. 21-5430(e)(1).

5

So we must follow that breadcrumb to see how K.SA. 2021 Supp. 21-5701 defines controlled substance.

Under K.S.A. 2021 Supp. 21-5701(a), "'[c]ontrolled substance' means any drug, substance or immediate precursor included in any of the schedules designated in K.S.A. 65-4105, 65-4107, 65-4109, 65-4111 and 65-4113."

As further explanation, the schedules referenced in this definition are part of the Kansas Uniform Controlled Substances Act, which itself defines "controlled substance" the same as above. K.S.A. 2021 Supp. 65-4101(f). Put simply, the drug schedules are directly incorporated into the statute criminalizing drug distribution through this shared definition.

This leads us to the final breadcrumb. We must look to see if fentanyl is listed in any of the drug schedules listed. It is. Fentanyl is specifically listed as a Schedule II drug and further designated an opiate and prohibited under K.S.A. 65-4107(c)(9). We have arrived home. Fentanyl is a controlled substance.

Even so, Farr asserts that K.S.A. 21-5430(b), the statute under which Farr was charged contains an additional qualifier that is the linchpin of his argument. Remember, the statute provides: "Distribution of a controlled substance causing death is distributing a controlled substance in violation of K.S.A. 21-5705." So he argues the distribution must violate K.S.A. 21-5705. We turn to that statute to see if he is right.

Farr asserts the "only relevant part" of K.S.A. 21-5705 is subsection (a)(1), which provides:

6

"It shall be unlawful for any person to distribute or possess with the intent to distribute any of the following controlled substances or controlled substance analogs thereof:

"(1)*Opiates, opium or narcotic drugs*, or any stimulant designated in subsection (d)(1), (d)(3) or (f)(1) of K.S.A. 65-4107[.]" (Emphasis added.)

Because fentanyl is not a stimulant designated in subsection (d)(1) amphetamine, (d)(3) methamphetamine, or (f)(1) precursors to both amphetamine and methamphetamine, Farr contends that distributing fentanyl is only unlawful under the statute if fentanyl falls under "[o]piates, opium or narcotic drugs." In Farr's view, the omission of fentanyl from these definitions also means it is not a narcotic drug or opiate for which distribution is criminalized by K.S.A. 21-5705(a)(1).

Farr is correct that K.S.A. 21-5705 itself does not contain a definition for the terms "[o]piate," "opium," and "narcotic drug." Yet K.S.A. 2021 Supp. 21-5701, is the definitional section that expressly controls K.S.A. 21-5701 through K.S.A. 21-5717 and it does.

"(l) 'Narcotic drug' means any of the following . . . :
(1) Opium and opiate and any salt, compound, derivative or preparation of opium or opiate;
. . . .
"(m) 'Opiate' means any substance having an addiction-forming or addiction-sustaining liability similar to morphine or being capable of conversion into a drug having addiction-forming or addiction-sustaining liability." K.S.A. 2021 Supp. 21-5701.

See also K.S.A. 2021 Supp. 65-4101(dd), (ee) (defining terms identically).

Yet as the parties both note, fentanyl is expressly designated as a Schedule II controlled substance under K.S.A. 65-4107(c)(9) within the category of "opiates."

7

Although Farr insists the Legislature only incorporated specific portions of the drug schedules into K.S.A. 21-5705, he is wrong. The statute broadly criminalizes unlawful distribution of *controlled substances*, which are statutorily defined by reference to the drug schedules. K.S.A. 2021 Supp. 21-5701(a). By designating fentanyl as a Schedule II controlled substance and describing it as an opiate, the Legislature clearly intended the specific definitions of those terms to apply.

Moreover, the Kansas Supreme Court's decision in *State v. Brown*, 321 Kan. 1, 573 P.3d 237 (2025), is instructive, if not controlling. In that case, the court held: "While the presence of THC in a substance may be relevant to a fact-finder's determination of whether a substance is marijuana, '[p]roof of the presence of THC is not required to meet the statutory definition of marijuana.'" 321 Kan. at 8. To reach that conclusion, the court adopted an identical rationale as the one expressed above, stating:

> "As discussed, the State charged Brown with first-degree felony murder with distribution of marijuana as the predicate felony. K.S.A. 21-5705(a)(4) criminalizes the distribution of controlled substances:  'It shall be unlawful for any person to distribute . . . any of the following controlled substances or controlled substance analogs thereof:  [including] any hallucinogenic drug designated in subsection (d) of K.S.A. 65-4105.' And K.S.A. 65-4105(d)(17) lists 'Marijuana' as a hallucinogenic drug. Thus, the State was required to prove that Brown distributed marijuana." 321 Kan. at 8.

Accordingly, we find that distribution of fentanyl is criminalized by K.S.A. 21-5705(a)(1), and by extension that distribution of fentanyl causing death is criminalized by K.S.A. 21-5430(b). Thus, the State correctly charged Farr with a Kansas crime, and the district court had subject matter jurisdiction over the charged offense.

*There was sufficient evidence to show that Farr distributed a controlled substance.*

As an alternative argument, Farr contends that the State failed to prove that the fentanyl he distributed was the *type* of controlled substance criminalized by K.S.A. 21-5705(a)(1).

When a defendant challenges the sufficiency of the evidence in a criminal case, appellate courts view the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. The court will not reweigh or resolve evidentiary conflicts or pass on the credibility of witnesses. *State v. Mendez*, 319 Kan. 718, 723, 559 P.3d 792 (2024). As above, this court exercises unlimited review over questions of statutory interpretation. *State v. Betts*, 316 Kan. 191, 197, 514 P.3d 341 (2022).

To convict an individual of a crime, the State must prove to the trier of fact beyond a reasonable doubt of the existence of every element of the offense. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979).

As in the previous section, the crux of Farr's sufficiency argument is that the State failed to prove fentanyl meets any of the precise statutory definitions of "[o]piates, opium or narcotic drugs, or any stimulant designated in subsection (d)(1), (d)(3) or (f)(1) of K.S.A. 65-4107" as criminalized in K.S.A. 21-5705(a)(1).

But as explained above, *Brown* effectively forecloses Farr's argument. *Brown*, 321 Kan. at 8. And although not mentioned by either party, this court recently addressed a similar argument in *State v. Cantu*, 66 Kan. App. 2d 274, 580 P.3d 1270 (2025), *rev. denied* 321 Kan. 791 (2026). In that case, the defendant raised a sufficiency of the evidence claim to challenge his conviction for unlawful possession of methamphetamine. He argued that despite the designation of methamphetamine as a Schedule II controlled

9

substance "'having a potential for abuse associated with a stimulant effect on the central nervous system,'" the State still needed to prove that the methamphetamine he possessed met that same description as an element of the offense. 66 Kan. App. 2d at 277. In line with unpublished decisions from previous panels, this court rejected the defendant's interpretation to hold that the State needed only to prove that the defendant possessed methamphetamine to sustain the conviction. 66 Kan. App. 2d at 278-79. Proving that the substance in the defendant's possession was methamphetamine was enough because "it would be redundant to require the State to prove qualities of methamphetamine that are already incorporated into the statute's definition of the substance." 66 Kan. App. 2d at 279.

While *Brown* and *Cantu* involved different crimes and different types of controlled substances, the same rationale applies. As explained in the previous issue, the Legislature designated fentanyl as a Schedule II controlled substance, and particularly categorized it as an opiate, leading to the logical conclusion that the unlawful distribution of fentanyl is prohibited under K.S.A. 21-5705(a)(1). But more importantly, that designation and categorization shows the Legislature has already signified its intent to treat fentanyl as a "substance having an addiction-forming or addiction-sustaining liability similar to morphine or being capable of conversion into a drug having addiction-forming or addiction-sustaining liability." K.S.A. 2021 Supp. 21-5701(m). Requiring the State to prove that the fentanyl Farr distributed to Ebert—which Farr readily admitted—had the addictive qualities that have already been statutorily defined would be redundant.

In short, the State only needed to prove that Farr distributed fentanyl in violation of K.S.A. 21-5705(a)(1) to satisfy that element of the charged offense of distribution of a controlled substance causing death. Because Farr admitted he sold fentanyl to Ebert, we find there was sufficient evidence to support that element of the offense.

THE DISTRICT COURT DID NOT ERR BY FAILING TO INSTRUCT THE JURY TO CONSIDER WHETHER FARR DISTRIBUTED A CONTROLLED SUBSTANCE

Farr also contests his distribution of a controlled substance causing death conviction by challenging the jury instruction, relying on the same underlying argument as addressed above. Thus, he contends the elements instruction for the charge was legally infirm because it omitted the precise legal definitions of "[o]piates, opium or narcotic drugs." Farr does not establish that he is entitled to relief on this point.

To start, a review of the record shows that Farr invited the error that forms the basis of his instructional error claim. The invited-error doctrine prevents a party who has led the district court into error from complaining of that error on appeal. *State v. Roberts*, 314 Kan. 835, 846, 503 P.3d 227 (2022). Whether invited error applies is a question of law subject to unlimited review. *State v. Douglas*, 313 Kan. 704, 706, 490 P.3d 34 (2021).

A party's failure to object to a proposed instruction does not automatically trigger invited error. See *State v. Fleming*, 308 Kan. 689, 701-02, 423 P.3d 506 (2018). Nor does it automatically apply every time a party requests an instruction and then claims error on appeal. 308 Kan. 689, Syl. ¶ 4. The Kansas Supreme Court has, however, found invited error when the party proposing an instruction could have ascertained the instructional error at the time. 308 Kan. at 703; *State v. Brown*, 306 Kan. 1145, 1166, 401 P.3d 611 (2017) (defendant invited error by proposing pretrial instruction that defined an offense more broadly than charged by the State).

Here, the district court gave a jury instruction on the elements of the charged offense that was essentially identical to the version submitted by Farr. About a month before trial, Farr submitted the following proposed instruction that was modeled after PIK Crim. 4th 54.201 (2025 Supp.):

11

"The defendant is charged with unlawfully distributing a controlled substance causing death. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

"1)     The defendant distributed fentanyl.

"2)     The death of Jayson Ebert result [*sic*] from his use of fentanyl distributed by the defendant.

"3)     This act occurred on or between the 3rd day of September, 2021 and the 5th day of September, 2021 in Pottawatomie County, Kansas.

"It is not a defense that Jayson Ebert contributed to his own death by using the controlled substance.

"'Distribute' means the actual, constructive, or attempted transfer of an item from one person to another, whether or not there is an agency relationship between them. 'Distributed' includes sale, offer for sale, or any act that causes an item to be transferred from one person to another.

"'Distribute' does not include acts of administering, dispensing, or prescribing a controlled substance as authorized by law.

"'Resulted from' means that the State must prove that Jason [*sic*] Ebert would not have died but-for his use of heroin distributed by McKaine Farr. It is not enough for the State to prove only that the use of heroin distributed by McKaine Farr contributed to Jason [*sic*] Ebert's death.

"'Use' means injection, inhalation, ingestion, or other introduction into the body."

There are no material differences between Farr's proposed instruction and the final jury instruction, at least with respect to his current claim of error. The challenged instruction followed the standard pattern instruction, which also does not include specific legal definitions for the terms Farr claims should have been given. See *State v. Zeiner*, 316 Kan. 346, 353, 515 P.3d 736 (2022) (noting that the Kansas Supreme Court "'strongly recommend[s] the use of PIK instructions, which knowledgeable committees develop to bring accuracy, clarity, and uniformity to instructions'").

12

Consequently, we decline to consider any complaint of error related to the omission of the precise legal definitions of "[o]piates, opium or narcotic drugs."

DISTRIBUTION OF A CONTROLLED SUBSTANCE CAUSING DEATH DOES NOT REQUIRE THE CONTROLLED SUBSTANCE TO BE THE INDEPENDENTLY SUFFICIENT CAUSE OF DEATH

Farr's next two issues are also based on a similar underlying argument, which is that the State needed to prove the fentanyl was an independently sufficient cause of death to obtain a conviction for distribution of a controlled substance causing death. Accordingly, Farr argues his conviction must be reversed because: (1) there was insufficient evidence to prove that fentanyl alone would have caused Ebert's death; and (2) the district court erred by refusing to give Farr's proposed instruction on this point.

*There was sufficient evidence to establish that Ebert's death resulted from using fentanyl.*

When a defendant challenges the sufficiency of the evidence in a criminal case, appellate courts view the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. The court will not reweigh or resolve evidentiary conflicts or pass on the credibility of witnesses. *Mendez*, 319 Kan. at 723. As above, this court exercises unlimited review over questions of statutory interpretation. *Betts*, 316 Kan. at 197.

For this issue, Farr's sufficiency argument is directed at the element requiring the State to prove Ebert's death "results from" his use of the fentanyl distributed by Farr. K.S.A. 2021 Supp. 21-5430(b). To satisfy this element, the district court instructed the jury, in relevant part:

"2. The death of Jayson Ebert resulted from his use of the Fentanyl distributed by the defendant.

13

. . . .

"Death 'resulted from' use of Fentanyl if but for its' use death would not have occurred and death was a reasonably foreseeable consequence of the use of Fentenyl [*sic*]."

Farr primarily takes issue with the district court's instruction on the applicable law, but that brings up an interesting point about his sufficiency claim. Appellate courts will often look to the jury instructions to determine the elements of the offense that the State needed to prove, especially when the instructions define the crime more narrowly than the charging document. *State v. Couch*, 317 Kan. 566, 582, 533 P.3d 630 (2023), *abrogated on other grounds by State v. Garcia-Martinez*, 318 Kan. 681, 546 P.3d 750 (2024). But the Kansas Supreme Court has departed from that approach when the elements in the jury instruction deviate from the statutory elements listed in the charging document, i.e., by setting out the elements of a different subsection of the charged offense. *Couch*, 317 Kan. at 582 (citing *State v. Fitzgerald*, 308 Kan. 659, 423 P.3d 497 [2018]).

But Farr is not arguing that the elements in the jury instruction are different from the charged offense, like in *Couch* or *Fitzgerald*. Instead, he contends that the court erroneously instructed the jury on the applicable law for a particular element of the charged offense, then proceeds to argue that the State failed to prove the element was met under a legal standard never considered by the jury. Put another way, he conflates a sufficiency of the evidence claim with a jury instruction claim because the foundation of his sufficiency argument is that the jury was improperly instructed.

To the extent that Farr's argument can be parsed to a sufficiency of the evidence claim, he contends the State failed to prove that Ebert's use of the fentanyl distributed by Farr was an independently sufficient cause of Ebert's death. As support, he asserts that

14

the plain language of K.S.A. 21-5430(b) mandates that the victim's death "result[] from" their use of a single controlled substance.

There are no Kansas appellate decisions interpreting K.S.A. 21-5430(b). There is, however, a United States Supreme Court decision interpreting identical language in the federal counterpart to the Kansas statute. See *Burrage v. United States*, 571 U.S. 204, 134 S. Ct. 881, 187 L. Ed. 2d 715 (2014). In that case, the Court held

> "that, at least where use of the drug distributed by the defendant is not an independently sufficient cause of the victim's death . . . , a defendant cannot be liable under the penalty enhancement provision of 21 U.S.C. § 841(b)(1)(C) unless such use is a but-for cause of the death or injury." 571 U.S. at 218-19.

While Farr is correct that this court is not necessarily bound by that holding, there is no discernable difference between the "results from" language found in K.S.A. 21-5430(b) and its federal counterpart discussed in *Burrage*. But as Farr notes, the Kansas Supreme Court has said the traditional notion of proximate cause, even in a criminal case—albeit involving the connection between the crime and the damages for purposes of restitution—consists of both cause-in-fact and legal causation. *State v. Arnett*, 307 Kan. 648, 655, 413 P.3d 787 (2018). In *Arnett*, our Supreme Court held that cause-in-fact requires proof that "it is more likely than not that, but for the defendant's conduct, the result would not have occurred." 307 Kan. at 654. Legal causation, on the other hand, limits a defendant's liability to "when it was foreseeable that the defendant's conduct might have created a risk of harm and the result of that conduct and any contributing causes were foreseeable." 307 Kan. at 655.

Although not in the criminal context, both this court and the Kansas Supreme Court have relied on *Burrage* to explain the cause-in-fact standard, which is also referred to as actual causation. See, e.g., *Johnson v. Bass Pro Outdoor World*, 320 Kan. 325, 344,

567 P.3d 810 (2025) (holding in products liability case that a gun owner's volitional act in pulling the trigger while disassembling a gun was the but-for cause of the gun's discharge); *Allen v. Marysville Mutual Insurance Co.*, 54 Kan. App. 2d 730, 737, 404 P.3d 364 (2017) ("'Results from' at a minimum sets out a requirement of actual causation."). Put simply, based on our Supreme Court precedent, we must interpret the phrase "results from" to require both actual and legal causation in the context of K.S.A. 21-5430(b).

We find there was sufficient evidence to prove that the fentanyl he distributed in this case was the proximate cause of Ebert's death. While true that Ebert's cause of death was officially documented as a combination of fentanyl and cocaine intoxication, that was not the extent of the evidence on this point. The State's forensic pathologist expert offered multiple reasons why he believed fentanyl was the cause-in-fact of Ebert's death, which included its greater lethality, the physical conditions being more consistent with an opioid overdose rather than a cocaine overdose, and because Ebert had lower levels of cocaine metabolite in his body than expected with a cocaine overdose.

Further, the State's expert testified that Ebert had no active cocaine in his body, which could suggest usage any time within the week before his death, and that it was important to list both drugs as contributing to the cause of death since they were both present. A rational factfinder viewing this evidence in the State's favor could conclude that Ebert's death resulted from his use of fentanyl, given that it presented as an opioid overdose, which would mean that it was an independently sufficient cause of Ebert's death.

The jury also heard evidence as to legal causation. Farr admitted in a recorded interview with a KBI agent that he knew the pills he sold Ebert contained fentanyl and that taking an entire pill "is a death wish." So there was sufficient evidence to establish that it was foreseeable that selling pills to someone that contained fentanyl could result in

16

death. Therefore, the State presented sufficient evidence to establish that Ebert's death resulted from using fentanyl that Farr sold him.

*It was not reversible error for the district court to refuse to give Farr's proposed instruction.*

Farr argues that the court erred in failing to provide the elements instruction he requested. This goes hand in hand with this argument that there was insufficient evidence of causation to convict him.

Farr proposed the following language for the elements instruction:

"To establish this charge, each of the following claims must be proved:

. . . .

"2)     The death of Jayson Ebert result [*sic*] from his use of fentanyl distributed by the defendant.

. . . .

"'Resulted from' means that the State must prove that Jason [*sic*] Ebert would not have died but-for his use of [fentanyl] distributed by McKaine Farr. *It is not enough for the State to prove only that the use of* [*fentanyl*] *distributed by McKaine Farr contributed to Jason* [*sic*] *Ebert's death*." (Emphasis added.)

The district court declined Farr's request, instead instructing the jury as follows:

"To establish this charge, each of the following claims must be proved:

. . . .

"2. The death of Jayson Ebert resulted from his use of the Fentanyl distributed by the defendant.

. . . .

"Death 'resulted from' use of Fentanyl if but for its' use death would not have occurred and death was a reasonably foreseeable consequence of the use of Fentenyl [*sic*]."

17

This court analyzes jury instruction issues using a well-known three-step process: (1) determining whether the appellate court can or should review the issue, in other words, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits of the claim to determine whether error occurred below; and (3) assessing whether the error requires reversal, that is, whether the error can be considered harmless. *State v. Holley*, 313 Kan. 249, 253, 485 P.3d 614 (2021).

Farr clearly preserved this issue for review by requesting an instruction that was denied. So we move to the merits of his claim. Farr argues that the instruction given by the district court was legally inappropriate.

He contends the omission of the "contributed to" language in his proposed instruction was legally erroneous because *Burrage* also held that the resulting death cannot be from "a combination of factors to which drug use merely contributed." *Burrage*, 571 U.S. at 216.

Farr is correct that the Court in *Burrage* rejected the Government's permissive interpretation of the "results from" language "under which use of a drug distributed by the defendant *need not be a but-for cause of death,* nor even independently sufficient to cause death, *so long as it contributes to an aggregate force* (such as mixed-drug intoxication) that is itself a but-for cause of death." (Emphases added.) 571 U.S. at 214-16. But the primary reason the Court was not convinced to adopt the Government's interpretation stemmed from the language chosen by Congress in enacting the statute. 571 U.S. at 216 ("Congress could have written § 841[b][1][C] to impose a mandatory minimum when the underlying crime 'contributes to' death or serious bodily injury, or adopted a modified causation test tailored to cases involving concurrent causes. . . . It chose instead to use language that imports but-for causality.").

18

But the district court's jury instruction accurately recited the use of "results from" language in K.S.A. 21-5430(b) and added the State was required to prove both types of causation—cause in fact ("but for its use death would not have occurred") and legal causation ("death was a reasonably foreseeable consequence"). See *Arnett*, 307 Kan. at 654-55.

And more to the point, requiring but-for causation does not foreclose the possibility of multiple contributing factors playing a role in producing an outcome. Stated another way, an event can have multiple but-for causes. *Burnette v. Eubanks*, 308 Kan. 838, Syl. ¶ 3, 425 P.3d 343 (2018) ("Any perceived distinction between the phrases 'causing an event' and 'contributing to an event' is a distinction without a difference."). Although Farr's proposed instruction may have provided some clarity for the jury, the but-for causation instruction already encompassed the concept that fentanyl needed to cause Ebert's death. Accordingly, we find that the challenged instruction was legally appropriate, which means no instructional error occurred.

In sum, we find Farr has also failed to show he is entitled to reversal of his conviction for distribution of a controlled substance causing death on the grounds that the causation element was not met.

EVEN IF THE DISTRICT COURT ERRED BY ADMITTING EVIDENCE OF FARR'S PAST MISCONDUCT, WE FIND THE ERROR HARMLESS

Farr next argues the district court erred by admitting evidence that he previously sold fentanyl pills to another person, who overdosed on them.

To begin, the State does not dispute that Farr preserved his evidentiary challenge for appeal, and the record confirms as much.

19

The threshold question on the admission or exclusion of evidence is whether the evidence is relevant. *State v. Levy*, 313 Kan. 232, 237, 485 P.3d 605 (2021). Relevant evidence means it is "evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b). Relevance has two elements: a materiality element and probative element. 313 Kan. at 237. Evidence is material when the fact it supports is disputed or at issue in the case, and evidence is probative if it tends to prove a material fact. *State v. Shields*, 315 Kan. 814, 831, 511 P.3d 931 (2022). Appellate courts review materiality using a de novo standard of review, but review whether evidence is probative under an abuse of discretion standard. *State v. Alfaro-Valleda*, 314 Kan. 526, 533, 502 P.3d 66 (2022).

Farr contends the evidence that he previously sold fentanyl pills to Braden McMillan, who overdosed on those pills but survived, was not relevant because other evidence established that death was a reasonably foreseeable consequence of using fentanyl. He points to the statements he made during a recorded interview with a KBI agent, admitting that he knew the pills he sold Ebert contained fentanyl and that taking an entire pill "is a death wish." Farr also asserts that the jurors could use their common knowledge to conclude that death was a reasonable and foreseeable consequence of using fentanyl.

Farr acknowledges that "[t]he State 'had the burden to prove beyond a reasonable doubt all elements of the crime charged, including the fact and manner of the death . . . even if those limited aspects of the case were undisputed.'" *State v. D.W.*, 318 Kan. 575, 579, 545 P.3d 26 (2024). Yet Farr is correct that the State already proved the fact that death was a reasonably foreseeable consequence of using fentanyl through his admissions, so additional testimony from McMillan on that point was unnecessary and cumulative.

20

But we need not decide this question, which would require a reevaluation of the district court's perception of the evidence at trial. Even if we presume the evidence should not have been admitted, we still must uphold Farr's conviction if that error was harmless. An error is harmless when "there is a 'reasonable probability that error will or did affect the outcome of the trial in light of the entire record.'" *State v. McCullough*, 293 Kan. 970, 981-82, 270 P.3d 1142 (2012). According to Farr, allowing the State to present this evidence created the implication that he was continually "tricking people into unknowingly buying fentanyl" and made him look especially cruel in the eyes of the jury. The court did give a limiting instruction that directed the jury to consider the McMillan evidence solely as evidence that Ebert's death was a reasonably foreseeable consequence from using the fentanyl. And even without the additional evidence related to McMillan's overdose, it was still undisputed that Farr admitted he sold his friend fentanyl knowing that it was deadly if taken in excess. Based on the totality of evidence presented at trial, we find there is no reasonable probability that the jury would have acquitted him in the absence of the evidence of Farr's prior acts.

THE PROSECUTOR DID NOT COMMIT REVERSIBLE ERROR BY MAKING MISSTATEMENTS OF FACT AND LAW

Farr next argues he did not receive a fair trial because of statements made by the prosecutor during opening statements and closing arguments. He identifies three instances of prosecutorial error: (1) emphasizing Ebert's familial relationships at the beginning of opening statements, which elicited improper sympathy and stated facts not introduced into evidence; (2) discussing the government campaign slogan "'[o]ne pill can kill'" in during both opening statements and closing arguments, which stated facts also not introduced into evidence; and (3) shifting the burden to the defense during closing arguments by stating there was no evidence to suggest Ebert purchased the fentanyl pills from anyone but Farr.

21

Although Farr did not object to any of these claims of prosecutorial error before the district court, that does not prevent him from raising them for the first time on appeal. This court can consider the presence or absence of an objection in its analysis of the alleged error. *State v. Bodine*, 313 Kan. 378, 406, 486 P.3d 551 (2021).

Appellate courts review a claim of prosecutorial error using a two-step process, that essentially boils down to determining whether error occurred and then, if there was any error, did it prejudice the defendant. *Mendez*, 319 Kan. at 737.

First, the State concedes the prosecutor erred by discussing the names of Ebert's family members and some details about his life during opening statements because those facts were never introduced as evidence. See *State v. Stimec*, 297 Kan. 126, 128, 298 P.3d 354 (2013) (prosecutor cannot comment on facts not in evidence to divert the jury's attention from its role as a factfinder, or to make comments that are futile other than to inflame the passions of the jury). As the State notes, the court gave a common instruction directing the jury to disregard any statements from counsel that were not supported by the evidence. It is generally presumed that juries follow a court's instructions, and appellate courts weigh this factor when determining harmlessness. *State v. Brown*, 316 Kan. 154, 170, 513 P.3d 1207 (2022). Briefly mentioning the names of Ebert's family members and details about his life near the outset of trial was improper, but we find that there is no reasonable possibility that it contributed to the jury's verdict in light of the evidence establishing Farr's guilt and the limiting instruction given to the jury.

Farr's second claim of prosecutorial error relates to the prosecutor's reference to the government campaign slogan "'[o]ne pill can kill'" during both opening statements and closing arguments. During opening statements, the prosecutor said:

> "During voir dire, counsel and myself talked a lot about what you knew about
> drugs and what you know about fentanyl in particular. I think someone even used the

22

campaign that they use, 'One pill can kill.' But in 2021, it wasn't quite as knowledgeable. We were aware of the opioid epidemic. That's how it was termed. But the DEA wouldn't even launch the 'One pill can kill' campaign until September 27th of 2021, 22 days after Jayson Ebert died."

Then, during closing arguments, the prosecutor referred to its previous comment:

"So I want to kind of start with the easiest of kind of those little A, B and C. So on C, the death was a foreseeable consequence of the use of fentanyl. During voir dire, Mr. Clark asked if everyone realized or knew that fentanyl could kill you. As we learned here today, we sure do. I mean, we know this. I think someone said, 'One Pill Can Kill.' That campaign has been going, but not since after Jayson's death."

Farr contends these comments were also misstatements of evidence because the slogan appears nowhere in the trial record and it was improper to use it to help prove the foreseeability requirement. We agree that the "one pill can kill" slogan was not in evidence and therefore any discussion by the prosecutor could be construed as error. However, we have to look at the comments in context. Although the prosecutor referred to the slogan, it was actually one that a juror disclosed and defense counsel questioned the juror about it during voir dire, not the prosecutor. Instead, the prosecutor repeatedly told the jury that the slogan was developed after the victim's death here, so in essence it could *not* be used to prove that Farr knew one pill could kill. The prosecutor appears to have been trying to eliminate the slogan from the jury's consideration, not highlighting it as proof of foreseeability.

Instead, as the State points out, Farr admitted during an interview that he was aware of the dangers of taking fentanyl, asserting that taking fentanyl in pill form "is a death wish." When the officer commented that "it sounds like people were chopping them up in either quarters or halves or something, they weren't taking the full pill," Farr said, "Never in a line, no." Given all the evidence and the context of the prosecutor's argument,

23

even if we assume error, there is no reasonable possibility that it contributed to the jury's verdict.

Lastly, Farr argues the State shifted the burden to the defense by stating that "[n]owhere in this timeframe, from the time that [Ebert] gets those pills from the defendant, is there any evidence to indicate [Ebert] bought pills from anyone else or got them from anyone else." This comment did not imply that Farr failed to present contrary evidence but was an accurate commentary on the evidence that the State had presented to establish the timeline between Ebert purchasing the fentanyl pills from Farr up to his death. We find that Farr fails to establish the prosecutor erred on this point.

CUMULATIVE ERROR DOES NOT REQUIRE REVERSAL HERE

For his final claim of trial error, Farr contends the cumulative effect of the above errors deprived him of a fair trial.

Cumulative trial errors, when considered together, may require reversal of the defendant's conviction when the totality of the circumstances establish that the defendant was substantially prejudiced by the errors and denied a fair trial. But the cumulative error rule does not apply if there are no errors or only a single error. *State v. Lowry*, 317 Kan. 89, 100, 524 P.3d 416 (2023).

Farr established three errors in this appeal that should factor into a cumulative error analysis: the district court's admission of irrelevant evidence about a prior overdose involving Farr, the prosecutor's erroneous comments referring to Ebert's family members and details about his life during opening statements, and the prosecutor's reference to the slogan "[o]ne pill can kill" in both his opening and closing statements. In line with the harmless error analyses conducted for each of these individual errors, we find that there is no reasonable possibility that their aggregate effect deprived Farr of a fair trial. As the

24

State explains, any prejudicial effect of these disjointed errors was ameliorated by the district court's jury instructions, and the evidence of Farr's guilt was strong. Farr admitted to distributing fentanyl to Ebert, and there was sufficient evidence to establish beyond a reasonable doubt that Ebert's death resulted from his use of that fentanyl. Therefore, we affirm Farr's conviction.

THE DISTRICT COURT'S FAILURE TO ADVISE FARR OF HIS DUTY TO REGISTER UNDER KORA UNTIL SENTENCING DOES NOT REQUIRE US TO VACATE THE REGISTRATION ORDER

Lastly, Farr challenges the district court's failure to make a discretionary finding at the time of his *conviction* that he register as an offender "for an offense not otherwise required as provided in the Kansas offender registration act." K.S.A. 2021 Supp. 22-4902(a)(5). More specifically, a person who is "adjudicat[ed] for an offense requiring registration as provided in K.S.A. 22-4902" must be informed at the time of conviction of the procedure to register and the requirements of K.S.A. 22-4905. K.S.A. 22-4904(a)(1)(A). Farr was not advised until sentencing. He contends that we must vacate his registration order.

To begin, Farr recognizes he is challenging the registration order for the first time on appeal but asserts this court can address it as a legal question arising on undisputed facts that will resolve the case. See *State v. Allen*, 314 Kan. 280, 283, 497 P.3d 566 (2021) (recognizing preservation exceptions).

Even so, the decision to review an unpreserved claim under a recognized exception is a prudential one, and this court is not obligated to consider an unpreserved issue for the first time on appeal. *State v. Genson*, 316 Kan. 130, 135, 513 P.3d 1192 (2022) ("[I]f a claim is not effectively raised below, the general rule gives appellate courts the discretion to refuse consideration of that issue.").

Recently a panel of this court was found to have abused its discretion for agreeing to consider the merits of Aaron Douglas Unruh's constitutional claims related to his KORA registration requirements. The Supreme Court found that his due process theories were not amenable to resolution on the merits given the existing record. *State v. Unruh*, 320 Kan. 260, 265, 565 P.3d 825 (2025). Here, unlike Unruh, Farr makes only a statutory claim. Thus, it is purely a question of statutory interpretation on undisputed facts. Farr does not argue that the discretionary finding by the court under K.S.A. 2021 Supp. 22-4902(a)(5) was unreasonable, only that its timing under K.S.A. 22-4904(a)(1) renders it void. We elect to exercise our discretion to reach the merits of Farr's newly minted KORA claim. It is easily determined on the existing record and Kansas Supreme Court precedent.

The duty to register under KORA arises by operation of law based on statutorily prescribed conditions precedent. *State v. Thomas*, 307 Kan. 733, 748-49, 415 P.3d 430 (2018). There are three sets of statutorily defined conditions that can give rise to a duty to register: (1) a conviction under one of several enumerated statutes; (2) the fact of a conviction plus some statutorily permitted judicial factfinding; or (3) a discretionary judicial order. 307 Kan. at 748. A person must register as a drug offender if convicted of K.S.A. 21-5705(a)(1) (distribution of opiates). K.S.A. 22-4902(f)(1)(C). A person must register as a violent offender if convicted of various levels of murder and manslaughter. K.S.A. 22-4902(e)(1)(A)-(E). Both require registration for 15 years. K.S.A. 22-4906. But a conviction for distribution of fentanyl causing death under K.S.A. 21-5430(b), a severity level one felony, is not a listed crime that requires registration under either scheme. Accordingly, any order requiring registration would fall under the court's discretionary authority under K.S.A. 22-4902(a)(5) ("'Offender' means . . . any person required by court order to register for an offense not otherwise required as provided in the Kansas offender registration act.").

At the sentencing hearing, the district judge noted that this was clearly a legislative oversight and he was prepared to make a discretionary finding under K.S.A. 22-4902(a)(5).

> "MS. SCHUCK: Yeah. Judge, I just needed—in light of some e-mails, I think that all of us were on, in light of a question that Mr. Clark had asked, I believe, that the Court was going to require Mr. Farr to register pursuant to the Kansas Offender Registration Act.
>
> "THE COURT: Yeah, that—I am glad you brought that up. I had forgotten that. But I do feel that, frankly, I think it was probably an oversight by the legislature. You can be required to register for distributing a controlled substance conviction. You certainly should be required to register if you are convicted of distributing a controlled substance that causes death."

He ordered Farr to register for 15 years which would begin upon his release onto postrelease supervision, which would be over 10 years after sentencing. See K.S.A. 22-4906(a). It is unclear whether he was ordered to register as a violent offender or a drug offender, but the term is 15 years either way.

But according to Farr, the district court needed to make the discretionary findings at the time of his conviction. Failing to do so until the time of sentencing, he argues, means his registration obligation was never triggered. Therefore, it must be vacated. He bases this argument on the language in K.S.A. 22-4904(a)(1) requiring the district court to provide an offender with notice of their duty to register "[a]t the time of conviction or adjudication for an offense requiring registration as provided in K.S.A. 22-4902." As support, he relies heavily on Justice Stegall's concurrence in *State v. Juarez*, 312 Kan. 22, 29-30, 470 P.3d 1271 (2020) (Stegall, J., concurring), which took the position that Farr now asserts: a district court loses its authority to make the necessary factual findings—thereby preventing the imposition of a registration obligation under KORA—if not made at the time of conviction.

27

To determine the merits of Farr's claim, we begin with the well-known rule that this court is duty bound to follow Kansas Supreme Court precedent unless there is some indication that the Supreme Court is departing from its previous position. *State v. Patton*, 315 Kan. 1, 16, 503 P.3d 1022 (2022). Our Supreme Court has dealt with this issue in some form three times.

Two of the cases addressing this issue were issued on the same day, *State v. Marinelli*, 307 Kan. 768, 790, 415 P.3d 405 (2018), and *Thomas*, 307 Kan. 733. The facts and claims in each are important to review.

In *Thomas*, the majority opinion was written by Justice Stegall, joined by Justices Biles, Luckert and Chief Justice Nuss. Exotic dancer Sheena Thomas was convicted by a jury of one count of aggravated battery with a deadly weapon (a stiletto heel) against a fellow dancer. Following her conviction, the district court sentenced Thomas to serve 12 months in prison but released her on probation for a term of 24 months. The court told Thomas: "'This is a registration case. I am informing you, you have a duty under the Kansas Offender Registration Act to register according to that law.'" 307 Kan. at 735. But the district court never made a finding on the record that she was required to register because a deadly weapon was used in the commission of the crime. The journal entry of judgment made no mention of Thomas' duty to register. "The Court of Appeals held that the district court's failure to make a deadly weapon finding meant she could not be required to register, so it 'vacate[d] that portion of Thomas' sentence . . . and remand[ed] this matter to the district court' so that it could make a finding that the shoe was a deadly weapon. *Thomas*, 2014 WL 3020029, at *12." 307 Kan. at 746. The only issue before the Supreme Court was whether the remand was proper. It found it was not.

The majority found that the duty to register under KORA springs into existence by operation of law. When the statutorily described conditions precedent do not exist, there is and can be no duty to register. And when the conditions precedent are not established,

remanding the case to the district court to make such a finding erroneously gives the State a second bite at the apple. 307 Kan. at 748-49. Accordingly, by failure to make a deadly weapon finding on the record, Thomas' duty to register never sprang into existence— therefore there was not a duty to register. Remand was not an appropriate remedy, instead the court was required to vacate the registration order. 307 Kan. at 750. Three justices agreed that the registration order must be vacated, but for different reasons, and each specifically rejected "the majority's newly manufactured 'springing obligation' theory." 307 Kan. at 751 (Rosen, J., concurring and dissenting, joined by Beier and Johnson, JJ.) and 307 Kan. at 752 (Johnson, J., concurring, joined by Beier and Rosen, JJ.). The same three justices, also noted, that

> "[t]he first thing to notice is that K.S.A. 2017 Supp. 22-4904(a)(1)(B) comes into play only after the defendant has been convicted of a qualifying offense and 'is released.' The triggered-by-conviction theorists would interpret 'is released' as including a convicted person who bonds out of jail while awaiting sentencing. Cf. K.S.A. 2011 Supp. 22-4904(a)(2) (which applied only 'if the offender [was] released on probation, receiv[ed] a suspended sentence, sentenced to community corrections or released on postrelease supervision'). But even if 'is released' includes bonding out of jail before sentencing, the registration event is the *release*, not the conviction. Those that do not bond out after conviction will not incur the obligation to register until sometime later, after sentencing." 307 Kan. at 756 (Johnson, J., concurring, joined by Beier and Rosen, JJ.).

The same day as *Thomas,* the court issued its decision in another KORA registration case, *Marinelli*. The majority opinion was written by Justice Biles, joined by Justices Stegall, Luckert, and Chief Justice Nuss. Again, we examine the facts.

Christopher Marinelli pleaded no contest to aggravated assault with a deadly weapon. The acknowledgement of rights and entry of plea that Marinelli signed the same day, indicated he would *not* be subject to KORA registration. The issue of registration under KORA did come up at sentencing. Marinelli objected to it being considered

29

because he had not been given notice at the time of conviction as required by K.S.A. 22-4904(a)(1) and there had been no "deadly weapon" finding on the record. 307 Kan. at 771.

The district court rejected Marinelli's argument, finding that the elements of the offense to which he pled included the reasonable apprehension of immediate bodily harm with a deadly weapon. The court found that no further finding was necessary. But the court did give Marinelli a chance to withdraw his plea because of the lack of knowledge at the time of his plea of the registration requirement. Marinelli declined the offer. 307 Kan. at 771.

Our Supreme Court had no problem finding Marinelli was a violent offender, even though that finding was not made until sentencing and was only set out in the sentencing journal entry. 307 Kan. at 789. It then turned to whether the court's untimely notification relieved Marinelli of his duty to register. The court found that legislative context and history suggests the timing requirement is to help ensure offenders know of their registration obligations when they are released—because that is when the duty arises. If an individual fails to register within three days of release, they could be charged with a new crime for failure to register. "The statutory directive to inform the offender about registration and complete a duty to register form before release serves a purpose of preventing lack of knowledge from being raised as a defense to a new charge for failure to register." 307 Kan. at 790. But the court went on to note that "[n]o provision in KORA creates a consequence for the failure to inform a defendant at the appropriate time. . . . In other words, under the plain language of K.S.A. 2017 Supp. 22-4902, neither the fact of notice or its timing are dispositive to whether a person is an 'offender' and, therefore, subject to registration requirements." 307 Kan. at 790-91. The court recognized that there could be situations in which a defendant was disadvantaged by not receiving the notice until sentencing, but that was not the case with Marinelli. He did not claim prejudice. The Supreme Court noted that the district court did ultimately advise Marinelli of the notice to

30

register and even gave him the option to withdraw his plea. 307 Kan. at 791. So the Supreme Court concluded that Marinelli was required to register.

Justice Rosen, joined by Justices Beier and Johnson, again filed a separate concurrence, but they did not challenge the ultimate conclusion. Their opinion focused on the nuances of jurisdiction. 307 Kan. at 791-96.

That brings us to *Juarez* as the most recent case interpreting the application of K.S.A. 2019 Supp. 22-4902(a). Giovanni Juarez pled no contest to aggravated battery for hitting a guard in the face hard enough to break his eye socket. Juarez' crime was not listed in K.S.A. 2019 Supp. 22-4902(e)(1) as a crime that automatically required registration. He was not notified of his duty to register at the time of his plea. He remained in jail until sentencing when the judge informed him that he was ordering him to register as a violent offender. He based this discretionary finding under K.S.A. 22-4902(a)(5) on the fact that "[a] person likely to strike out at others without provocation, trigger, or reason certainly is within the category of persons of which the public should be aware. Therefore, it is my opinion that the defendant should be required to register as a comparable offense under the Kansas Offender Registration Act." 312 Kan. at 23-24.

Juarez objected to the lack of notice but offered no evidence to dispute the court's findings. On appeal, the court was only tasked with determining whether the failure to provide notice of a duty to register until sentencing deprived Juarez of his opportunity to be heard—a violation of his due process rights. 312 Kan. at 26. A plurality of the court, led by Justice Wilson, held, consistent with *Marinelli*, 307 Kan. at 790, that there was not a due process violation under the facts of the case before it.

> "[T]he 'notice' required, within the context of KORA, is the act of informing a defendant of the fact of his duty to register. And as we have previously observed, 'No provision in KORA creates a consequence for the failure to inform a defendant at the appropriate

time.' *State v. Marinelli*, 307 Kan. 768, 790, 415 P.3d 405 (2018)." *Juarez*, 312 Kan. at 25.

The three justices found it significant that during the six-week period between plea and sentencing Juarez remained incarcerated.

"While he remained incarcerated, Juarez could not violate KORA because any responsibility to register for his conviction had not yet arisen. The notice of his duty gave him equal benefit at the time he received it as it would have given him if he had received the notice at the time of his conviction." 312 Kan. at 25.

Accordingly, the court found that Juarez had failed to establish a due process violation. But the court went on to say "we express no opinion on the underlying validity of the district court's registration order, and Juarez does not challenge the constitutionality of the KORA notice provision itself—just the timeliness of the notice provided by the district court." 312 Kan. at 26. Four justices filed or joined a total of three separate opinions.

While Kansas courts recognize the stare decisis doctrine—which holds that points of law established by a court are generally followed by the same court and lower courts in later cases—plurality opinions present unique challenges because they lack the full endorsement of a majority of the justices. United States Supreme Court Justice William Brennan often joked that a critical talent for a Supreme Court Justice was the ability to count to five. Lewis, *In Memoriam: William J. Brennan, Jr.*, 111 Harv. L. Rev. 29, 32 (1997). For a Kansas Supreme Court Justice, the number is four.

"When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .'" *Marks v. United States*, 430 U.S. 188, 193, 97 S. Ct. 990, 51 L. Ed. 2d 260 (1977).

Taking this wise approach, we note that in *Juarez* four Kansas justices agreed that the rationale used in *Marinelli* is still sound. See *Juarez*, 312 Kan. at 25. Justice Biles filed a concurring opinion, stating his belief that *Marinelli* controlled the outcome. "[W]ithout question, the district court erred when it failed to do so, but that timing problem does not excuse his registration duties. No provision in the law creates a consequence for the failure to inform a defendant at the statutorily appropriate time." 312 Kan. at 27 (Biles, J., concurring). He went on to note that KORA does not require a court to give advance notice of its intention to impose the discretionary registration requirement. 312 Kan. at 27; see K.S.A. 22-4904(a)(1) (At the time of conviction or adjudication "for an offense requiring registration" the court shall inform the offender, on the record of the registration requirement.).

Three disagreed. Two justices would have found *Marinelli* distinguishable and believed Juarez' due process rights were violated. *Juarez*, 312 Kan. at 30-33 (Rosen, J. dissenting, joined by Beier, J.). They believed it was critical that Marinelli had been given an opportunity to withdraw his plea and Juarez was not. "Due process required Juarez be afforded notice of this consequence before he decided to forgo a defense." 312 Kan. 32-33 (Rosen, J., dissenting, joined by Beier, J.).

Finally, Justice Stegall did not dissent but concurred in the result. He found *Thomas* controlling rather than *Marinelli*. *Juarez*, 312 Kan. at 28-29 (Stegall, J., concurring). Yet, he opined that by failing to make the discretionary finding at all, Juarez had no duty to register. Because he had no duty to register, his due process rights were not violated.

"Hence, when the necessary fact-finding is not made by a district court at the time of conviction—and the notice that goes along with it is not given—the defendant does not actually have a due process complaint. No process has been denied because the defendant is not an offender required to register under KORA. There has been no 'error'

33

at all. Far from being prejudiced by what happened at the time of conviction, Juarez benefitted from the district court's decision at that time to not make any registration findings." 312 Kan. at 30 (Stegall, J., concurring).

He concluded by noting that while it is unfortunate that "Juarez is burdened with a postconviction order purporting to make necessary fact-findings and order Juarez to register," there was no constitutional violation. 312 Kan. at 30.

So reviewing the case in the narrowest manner, we are guided by the decision in *Marinelli.* We find that even if the registration order was not explicitly made until sentencing, and even if a discretionary registration finding under K.S.A. 2021 Supp. 22-4902(a)(5) requires it be made at the time of conviction under K.S.A. 22-4904(a)(1)(A) (which only applies to offenses *requiring* registration under K.S.A. 22-4902), the order is not void on that basis. In fact, just like Marinelli, Farr cannot demonstrate—nor does he try to demonstrate—any prejudice by the timing of the order. Farr was incarcerated between verdict and sentencing. While he remained incarcerated, he could not violate KORA because the responsibility to register had not yet arisen. "The notice of his duty gave him equal benefit at the time he received it as it would have given him if he had received the notice at the time of his conviction." *Juarez*, 312 Kan. at 25. Farr's registration order is valid.

Affirmed.